**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **MICHAEL SHORE** | : | **NO. 17-502** |

**<u>MEMORANDUM OPINION</u>**

**Savage, J.**                                                         **July 7, 2020**

The defendant Michael Shore, who has Autism Spectrum Disorder ("ASD"), has moved to bar application of the 15-year mandatory minimum sentence and for a variance from the sentencing guideline of life imprisonment on his conviction of three counts of manufacturing child pornography in violation of 18 U.S.C. §§ 2251(a).  He argues that imposition of the mandatory 15-year sentence, as applied to him, violates the Eighth Amendment prohibition against cruel and unusual punishment.[1]  He contends that taking into consideration his "unique psychological and emotional history,"  the 15-year sentence is grossly disproportionate to the offenses.

The government opposes the motion, citing well established precedent that counsels against sustaining a challenge to a statutory mandatory minimum sentence.  It argues that such a challenge is reserved only for the extraordinary case and this case is not one of them.  The essence of the government's position is that the 15-year sentence is not "grossly disproportionate" to the manufacturing offense.

---

[1]  He does not challenge the mandatory minimum ten-year and five-year sentences on other counts.

The mandatory 15-year sentence in Shore's case is harsh and does not serve all penological goals.  Taking into consideration his ASD and its role in the offense conduct, the sentence raises an inference of gross disproportionality between the gravity of the offense and the severity of the sentence.  Nevertheless, when looking at sentences in this district and other districts for the same offenses by defendants with and without mental conditions, a 15-year sentence in this case is not unusual.  Therefore, because it does not violate the Eighth Amendment, we must deny the motion to disregard the legislatively mandated 15-year sentence.

Although the mandatory sentence must be imposed, the life sentence under the Sentencing Guidelines need not.  Consideration of the constellation of the factors set forth in 18 U.S.C. § 3553, without emphasis on any one factor to the exclusion of others, merits a variance.  Thus, to the extent the defendant's motion seeks a variance, we shall grant it.

### The Offense Conduct

Shore entered an open guilty plea to five counts of use of an interstate commerce facility to entice a minor to engage in sexual conduct in violation of 18 U.S.C. § 2422(b), three counts of manufacturing and attempting to manufacture child pornography in violation of 18 U.S.C. § 2251(a), one count of distribution of child pornography in violation of 18 U.S.C. § 2252(a)(2), and one count of possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B).  The charges arose out of his interactions with four minors.

For purposes of addressing the specific challenge to the 15-year mandatory minimum sentence, we recite only the facts relating to the manufacturing offenses.  It is that conduct that must be examined to perform the proportionality analysis.

Shore, 33 years old at the time, communicated with a 12-year old minor via Facebook, cell phone and text messaging.  The minor's mother, upon discovering the communications, directed him to stop.  Despite the warning that her daughter was only 12, Shore continued to communicate with her by private, direct messaging.  The sexually graphic messages requested nude photos and solicited sex.  Shore sought photos of her in the shower masturbating.

Shore engaged in similar sexually graphic communications with two other young girls, 14 and 16 years old.  In these instances, Shore expressed his desire to have sex with them.  The 14-year old responded to his requests by sending him photos of her naked and topless.  The 16-year old, who turned 17 during the time of the communications, sent five photos depicting her nude or in a sports bra and underwear.  Shore transmitted those photos to a woman in Chicago.

**Proportionality Analysis**

The Eighth Amendment "does not require strict proportionality between crime and sentence." *Ewing v. California*, 538 U.S. 11, 23 (2003).  "It forbids only extreme sentences that are 'grossly disproportionate' to the crime."  *Id.*

A severe sentence by itself is not unconstitutional.  *Harmelin v Michigan*, 501 U.S. 957, 994 (1991) (Kennedy, J., concurring in part and concurring in judgment).  In other words, the mere length of a sentence, no matter how long, does not justify invalidating a legislatively mandated sentence.  Consequently, a successful proportionality challenge to a mandatory sentence is "exceedingly rare."  *Hutts v. Davis*, 454 U.S. 370, 374 (1982) (per curiam).

Before conducting the analysis, we recognize that we must grant substantial deference to Congress in determining the types and limits of punishment. *Solem v. Helm*, 463 U.S. 277, 290 n.16 (1983). At the same time, when determining whether a sentence violates the Eighth Amendment, courts may consider "the particular defendant and particular crime at issue." *Graham v. Florida,* 560 U.S. 48, 87 (2010) (Roberts, C.J., concurring in judgment).

The Supreme Court established the framework for analyzing an Eighth Amendment proportionality challenge in *Ewing v. California*, 538 U.S. 11, and *Solem v. Helm*, 463 U.S. 277. The Third Circuit explicated the analysis in *United States v. MacEwan*, 445 F.3d 237 (3d Cir. 2006), when it rejected a proportionality challenge to the same 15-year mandatory minimum sentence provision Shore attacks.

The proportionality analysis consists of three steps. First, the court determines whether a comparison between the gravity of the offense and the severity of the sentence gives rise to "an inference of gross disproportionality." If it does not, the inquiry ends. If it does, the court proceeds to the second and third steps. At the second and third steps, the court compares the defendant's sentence to sentences imposed on other offenders convicted of the same crime in the same jurisdiction (the intrajurisdictional inquiry) and those imposed for the same offenses in other jurisdictions (the interjurisdictional inquiry). *Solem*, 463 U.S. at 290-292; *MacEwan*, 445 F.3d at 247. Only if the intrajurisdictional and the interjurisdictional comparisons confirm the inference that the sentence is grossly disproportionate may a court find that it violates the Eighth Amendment.

Gravity of the Offense

In evaluating the gravity of the offense, we consider "the harm caused or threatened to the victim or society and the culpability of the [defendant]." *See Solem*, 463 U.S. at 292.  In examining the defendant's culpability, we consider his intent and motive. *Id.* at 293.  We also consider his criminal history.  *Rummell*, 445 U.S. at 276.

Shore's conduct constituting manufacturing was abhorrent.  He solicited young teenagers, 12 and 14 years old, to participate in sharing sexually charged photos he requested.  He encouraged them to expose themselves and solicited sexual engagement. He requested a 12-year old sixth grader to send him photos of her nude and in her underwear.  She responded, sending him a photo of herself in a sports bra and a towel around her waist.  He later asked for photos of her masturbating in the shower.  Another victim, a 14-year old, sent him photos of her topless and nude as requested.

These photos were for his own purpose.  He was not creating the images for dissemination or profit.  He was not in the business of child pornography.

No one questions that child pornography, especially its manufacture, is a serious crime that preys on the most vulnerable victims who bear the scars of exploitation for years and in many cases forever. Children are harmed physically, emotionally, and mentally, causing them difficulties in adjusting normally.  The insult lives on in perpetual circulation through the Internet.

Congress determined that severe penalties were needed because it found that child pornography is a "multimillion dollar industry" run from a "nationwide network of individuals" who "openly advertise their desire to exploit children and to traffic in child pornography."  Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-

248, 120 Stat. 587, 623.  The manufacturing penalty is aimed at those who prey upon children for their own greed.  It is not to penalize the mentally challenged who have no real appreciation of their offense and who live in a fantasy world.

Shore does not fit the profile of the offender Congress targeted for such a severe sentence.  He was not manufacturing child pornography for distribution or profit.  To apply the mandatory minimum mechanically without distinguishing between the two types of offenders – the callous and manipulative profiteer on the one hand, and the unwitting impaired person on the other – would result in a disparity.

The gravity of the offense is not measured solely by the community's moral outrage or the impact on the victim.  The defendant's culpability must be included.  We cannot assess the gravity of the offense without looking at the offender's state of mind and his mental state.  The criminal law has always considered the actors' *mens rea* when grading offenses for sentencing purposes.  For example, murder, the most heinous and serious offense, is classified by degrees that reflect the offender's state of mind.  Other crimes are likewise graded.

In his concurring opinion in *Graham*, Chief Justice Roberts identified the offender's state of mind as an essential component of the analysis.  Explaining the process, he wrote, "[t]his ['narrow proportionality'] analysis can consider a particular offender's mental state and motive in committing the crime, the actual harm caused to his victim or to society by his conduct, and any prior criminal history."  *Graham*, 560 U.S. at 88.

Indeed, considering the offender's state of mind as affecting his culpability is what led the Supreme Court to declare as a violation of the Eighth Amendment sentencing a juvenile to death for murder, *Roper v. Simmons*, 543 U.S. 551 (2005), a mentally disabled

defendant to death, *Atkins v. Virginia*, 536 U.S. 304 (2002), and a juvenile to life without parole for a non-capital crime. *Graham v. Florida*, 560 U.S. 48 (2010). Granted the mandatory 15-year sentence for manufacturing child pornography is not comparable to the ultimate penalty of death or a life sentence. But, the same factors bearing on the juvenile's mental development and appreciation of his wrongdoing are present in the case of a defendant with ASD.

Shore, like others with ASD, shares the same characteristics with juveniles whom the Supreme Court has found are "constitutionally different from adults for purposes of sentencing." *Miller v. Alabama*, 567 U.S. 460, 471 (2012). These include immaturity, impulsivity, and failure to appreciate the risks and consequences of their actions. The same analysis applies here.

Shore's ASD is a component of the culpability analysis. It bears on his perspective and appreciation of the wrongfulness of his offense conduct. It goes to his intent. Thus, we look at how ASD played a role in Shore's conduct.

Autism is a neuro-developmental disability involving the brain. It is characterized by the presence of narrow, repetitive behavior and differences and difficulties in social interaction, communication, and adjusting to change. A person suffering from ASD is neurologically impaired in his ability to appreciate the unacceptability of his conduct or to intuit why this conduct is unacceptable. Because of his difficulty observing social norms, an ASD individual may engage in socially disapproved or unacceptable behavior, with no consciousness of wrongdoing or a real sense of how his behavior is viewed by others.

ASD is defined in the DSM-V as typified by extreme social and emotional immaturity, the inability to read others or respond appropriately in social settings, lack of

intuitive awareness of social/moral/legal constraints, and intense and narrowly directed repetitive activities.   AM. PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-V) 50 (5th ed. 2013).  These features combine to create a risk of offensive behavior towards others without any offensive purpose.

Because they are typically isolated from their peers of the same age, persons with ASD have limited socio-sexual understanding.  They do not recognize sexual boundaries. They are naïve and socially awkward.  They have a desire to "fit in".  Yet, when they do, they fail to perceive and appreciate the feelings of others, and they engage in inappropriate behavior.  They are not antisocial, they are asocial.

"Much of the deviant or sexual offending behavior exhibited among those with ASD is often a manifestation of their ASD symptoms, and not malice."  M.C. Mogavero, *Autism, Sexual Offending, and the Criminal Justice System*, J. INTELLECTUAL DISABILITIES & OFFENDING BEHAV. 116-126 (2016).  How the lack of sociosexual understanding leads to inappropriate sexual behavior has been described as follows:

> We do recognize that problems with sexual expression and experiences can lead to a person with Asperger's syndrome being charged with a sexual offence. The charges tend to be for sexually inappropriate behaviour rather than sexually abusive or sexually violent behaviour (Ray, Marks and Bray-Garretson 2004). The person may have difficulty distinguishing between kindness and attraction, and assume a friendly act was an indication of romantic or sexual attraction. This can lead to a crush or infatuation with the person. Due to problems with Theory of Mind abilities and reading social cues, the person with Asperger's syndrome assumes that the degree of adulation is reciprocal, and signs of rejection or annoyance are not recognized. The person may be charged with offences related to stalking.

> The focus or expression of sexual pleasure can also be of concern.  For example, the person with Asperger's

syndrome may not have had the usual social, sensual and sexual experiences of typical adolescents, and may develop sexually arousing fantasies involving objects, clothing, children or animals. The technical term is paraphilia. Acting out some paraphilias is illegal. The person with Asperger's syndrome may have been sexually abused and subsequently repeat the offence with others, assuming such sexual behaviour is acceptable, or as an attempt to understand why someone would engage in, and appear to enjoy, such behaviour.

A curiosity and confusion regarding sexuality can lead to the desire for more information and the development of a solitary and clandestine special interest in pornography. There can then be the assumption that the sexual behaviour seen in films and described in magazines is a script for a first date. When certain suggestions are made, the person can be labeled a pervert or sexual deviant, and face the possibility of charges of sexual assault. There has been the suggestion that having Asperger's syndrome could be a factor in at least one case of sexual serial homicide (Silva, Ferrari and Leong 2002). Thus, I strongly advocate guidance in sexuality for adolescents and adults with Asperger's syndrome, using the programs designed by specialists in Asperger's syndrome (Henault 2005), and appropriate modifications for treatment programs for sexual offenders (Ray et al. 2004).

TONY ATWOOD, THE COMPLETE GUIDE TO ASPERGER'S SYNDROME 336 (Jessica Kingsley ed., 2007).

"Sexual curiosity and drive (along with a lack of appropriate channels for sexual expression and interaction) can lead individuals with AS to explore websites with child pornography without understanding the criminal and predatory context."  Michael D. Powers & James M. Loomis, *Asperger Syndrome in Adolescence and Adulthood*, *in* ASPERGER SYNDROME: ASSESSING AND TREATING HIGH-FUNCTIONING AUTISM SPECTRUM DISORDERS 331, 339 (James C. McPartland et al eds., 2d ed. 2006).  In other words, they have no appreciation of the seriousness or gravity of their transgressions.

9

Shore's ASD contributed to his offense conduct. Dr. Shawn Channel, a staff psychologist at Federal Medical Center, Devens, and Dr. Elliot Atkins, a clinical psychologist who tested and evaluated Shore, concluded that his ASD played a role in his behavior.[2]   Noting that ASD's role was "very complicated", Dr. Channel testified, "I believe [his ASD] contributed to his offense conduct."[3]   He testified that Shore's ASD impaired his understanding of the wrongfulness of his behavior.[4]

Dr. Atkins opined that "Michael's Autism Spectrum Disorder has contributed to his commission of the instant offenses in a manner that clearly differentiates him from those individuals that both Congress and the Sentencing Commission had in mind when the Sentencing Guidelines were crafted."[5] Dr. Atkins explained that Shore suffers from "severe deficits in social functioning and doesn't fully appreciate the impact of his behavior on others."[6]  He lacked the ability to understand that his actions were harmful to others. "He had very little or no appreciation of the harm he was doing."[7]

Shore, who is full of self-doubt and sees himself as socially alienated, has characteristic traits of ASD.  He has poor judgment skills.  He demonstrates a lack of remorse and empathy.[8]  He is socially immature.  Testing revealed a "profound immaturity

---

[2]  Transcript of Proceedings at 13, 68, *United States v. Shore*, No. 17-502 (E.D. Pa. July 31, 2018) ("Tr."); Letter from Elliot L. Atkins, Ed. D., P.A., to Burton A. Rose, Esquire 7 (Sept. 20, 2017) ("Atkins Rpt.") (on file with court).

[3]  Tr. at 97-98.

[4]  *Id.* at 99.

[5]  Tr. at 13; Atkins Rpt. 7.

[6]  *Id.*

[7]  Tr. at 11.

[8]  *Id.* at 52.

and dependency" that led him to create his own inner world.[9]  Deficits in socio-emotional reciprocity result in his over interpreting the degree of significance of a relationship.[10]  He functions socially and emotionally at the level of an adolescent.[11]  "He is still functioning much like a teenager himself and interacting like a young teenager instead of someone his own age."[12]

When the experts say an ASD individual lacks empathy, they  do not mean he is callous, sadistic or sociopathic.  It means he has extreme difficulty viewing the world through the eyes of others.  He does not notice when others suffer or he misunderstands others' feelings.  GARY B. MESIBOV ET AL., UNDERSTANDING ASPERGER SYNDROME AND HIGH FUNCTIONING AUTISM (2001).  Although an ASD individual may know it is wrong to induce children to engage in sexual behavior, he does not appreciate its impact or its consequences.

Having found that Shore's culpability in light of his ASD mitigates the gravity of the offense, we turn to the severity of the sentence.  Then, we must determine whether there is a "gross imbalance".

<u>Severity of the Sentence</u>

The severity of a sentence is not based solely on the length of years.  It must take into consideration the penological goals of sentencing – retribution, deterrence, incapacitation, and rehabilitation.  *Graham*, 560 U.S. at 71.  Of course, it balances these

---

[9]  Atkins Rpt. 6.

[10] Tr. at 64.

[11] Atkins Rpt. at 8.

[12] Tr. at 27-28.

goals in light of the defendant's unique and individualized characteristics and circumstances which we have already discussed.

Retribution is a legitimate basis for punishment.  But, the sentence must be "directly related to the personal culpability" of the defendant.  *Id.* (quoting *Tison v. Arizona*, 381 U.S. 137 (1987)).  We have already considered Shore's culpability as it was impacted by his ASD.  He was not as culpable as one without ASD or a defendant who profits from the exploitation of children.  Nonetheless, he deserves punishment for doing what he knew was wrong even though he did not appreciate the consequences of his actions, including the effects on the young children.  But, a 15-year sentence is not necessary to satisfy the need for retribution, especially when considered with the other penological goals.

Deterrence demands a substantial sentence.  It is necessary to deter others from manufacturing child pornography.  The mandatory 10-year sentence, which Shore does not challenge, will  serve as a sufficient deterrent.  Can anyone predict that a person committing this type offense would consider not doing it because there was a potential sentence of five or ten years rather than 15 years?  Where is the decisive point?  Just what sentence is a sufficient deterrent is an open question.  The sentence must be significant enough to act as a deterrent and not more than sufficient to accomplish this goal.  The mandatory 10-year sentence Shore does not challenge is sufficient deterrence.

Incapacitation is aimed at preventing recidivism.  As long as the offender is inclined to recommit the same offenses, he must be confined.  This goal intersects with the goal of rehabilitation.  If an offender cannot be rehabilitated, his incapacitation is necessary to prevent recidivism.  On the other hand, if he is capable of rehabilitation, his sentence

should be limited to the time sufficient to accomplish that goal, taking into consideration the other penological goals.

Shore can be rehabilitated.  There is no doubt that he would benefit from treatment that would reduce the risk of recidivism.  There are two types of treatment that would be beneficial.  First, there is specific sexual offender treatment that typically lasts between sixteen and eighteen months.  The second is treatment addressing his ASD symptoms. It entails treatment for social and emotional manifestations of his ASD.[13]  The treatment to address his thinking and judgment problems, his impulsivity and social problems could last several years.

With successful treatment, Shore could be "reasonably expected to conform his behavior to the law so that he does not reoffend."[14]  Treatment of ASD "specifically targets empathy training."[15]  It is aimed at people "with the social deficits associated with autism."

"Child pornography *only*" offenders are at extremely low risk of again committing the same type offense (1% over 6 years) and at very low risk of committing a hands on offense (3% over 6 years).[16]  Autistic persons have traits that militate against risks for

---

[13] Tr. at 20.

[14] *Id.* at 21.

[15] *Id.* at 327.

[16] The most recent data analysis addressing *typically developed* individuals show that the risks of reoffending as to child pornography for one who has no history of contact offenses is very low, and for a contact offense almost negligible. Autism is a countervailing factor to risk.  Persons with ASD are "rule bound".  Once taught that behavior is inappropriate and wrong, they rigidly conform to the rules.

Online offenders with no history of contact offenses almost never committed contact sexual offenses, despite a comparably higher interest in photographs of children compared to contact offenders. Kelly M. Babchishin, R. Karl Hanson & Heather VanZuylen, *Online Child Pornography Offenders are Different: A Meta-analysis of the Characteristics of Online and Offline Sex Offenders Against Children*, 49 ARCH SEX. BEHAV. 44-66 (2014).

There is only a one percent official recidivism rate for contact sexual offences and a three percent

reoffending.  Those traits – rigid adherence to social rules once learned – make them highly unlikely to reoffend.

Incarceration in this case has a positive and a negative side.  On the positive side, Shore can benefit from the Bureau of Prisons' psychological and psychiatric treatment specific to his offense conduct. These treatments are aimed at avoiding the consequences of future misbehavior.  On the negative side, Shore, like other inmates with autism, will have difficulty in dealing with other inmates because he will be unable to understand his effect on them, setting him up for manipulation and victimization.[17]  "His condition puts him at risk of injury and victimization and  psychological regression."[18]  An autistic inmate "could be readily exploited, abused or blackmailed by other inmates."[19]

After balancing Shore's diminished culpability against the gravity of the offense and considering the penological goals of sentencing, we conclude that application of the 15-year mandatory minimum sentence raises an inference of gross disproportionality. Thus, we proceed to compare the sentence to those imposed in this district and other district for the same offense.

<u>Intrajurisdictional Inquiry</u>

Fifteen of the 83 defendants convicted of violating § 2251(a) in this district received no greater than a 15-year mandatory minimum sentence.  No defendant received a

---

recidivism rate for child pornography offences after a *follow-up of up to six years.*  Michael C. Seto, R. Karl Hanson & Kelly M. Babchishin, *Contact Sexual Offending by Men With Online Sexual Offenses*, 23 SEX. ABUSE: J. RES. & TREATMENT 124-145 (2011).

[17] Tr. at 17.

[18] *Id.*

[19] *Id.* at 95.

sentence less than 180 months – the mandatory minimum.  The two defendants with Asperger's Syndrome were sentenced to 330 and 720 months' imprisonment, respectively.

Shore's conduct was significantly less egregious than the two defendants with Asperger's.  In those cases, the defendants engaged in contact with the minors.  The defendant sentenced to 720 months videotaped himself sexually abusing a two-year-old boy and a three-year-old girl.  The other defendant with Asperger's molested and took photographs of children engaging in sexual acts he directed.  Shore engaged in no physical contact with the young teenagers.

The sentences of the 83 defendants in this district demonstrate that a 15-year minimum sentence for a violation of § 2251(a) is not grossly disproportionate.  Indeed, a longer sentence may be considered proportionate.

There were nine cases where the mandatory 15-year sentence was imposed and the bottom of the sentencing range was above 180 months. Although this does not confirm gross disproportionality, it does support a variance when viewed under 18 U.S.C. § 3553(a)(6).

Interjurisdictional Inquiry

The guideline for violation of § 2251 is United States Sentencing Guidelines (USSG) § 2G2.1.  The base offense level is 32.  An enhancement under USSG § 41.5 adds five points to the offense level.

At our request, the Sentencing Commission provided sentencing results in cases of defendants convicted of a § 2251 violation and sentenced under USSG § 2G2.1 and a § 4B1.5 enhancement.  The Commission provided a statistical analysis of sentences for

three different scenarios which identify the  type of sentence imposed, the sentence relative to the guideline range, average sentence length, average guideline range, supervised release imposed, and the average term of supervised release.

This statistical data shows that on a national basis a 15-year prison sentence is not unusual, let alone grossly disproportionate, for a defendant convicted of violating § 2251.   Thus, we conclude that the intrajurisdictional and the interjurisdictional comparative analysis of sentences of those convicted of the similar offenses does not support a finding that a 15-year sentence in these circumstances is extreme and does not confirm the inference that a 15-year sentence is grossly disproportionate.

## Conclusion

Given Shore's individual characteristics, his diminished culpability, and the specifics of his offense conduct, a 15-year minimum sentence is harsh.  But, it is not cruel and unusual in violation of the Eighth Amendment.  Therefore, we must deny his motion to bar application of the 15-year mandatory minimum sentence.

All the factors bearing on our finding of an inference of gross disproportionality and under 18 U.S.C. § 3553(a) support a variance from the guideline of life imprisonment.