IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,      )

v.                               )     No. 2:17cr502

MICHAEL SHORE.           )

## MOTION FOR COMPASSIONATE RELEASE

Michael Shore ("Shore"), by and through the undersigned counsel, respectfully moves for compassionate release consistent with 18 U.S.C. § 3582(c)(1)(A) and U.S.S.G. § 1B1.13. Prior to sentencing the Court received testimony from defense and Government experts that Shore would benefit from sex offender treatment and treatment for his Autism Spectrum Disorder ("ASD"). Dr. Shawn Channell, a psychologist with the Federal Bureau of Prisons ("BOP"), specifically assured the Court that such treatment was available to Shore in the BOP. But over seven years later into Shore's incarceration, Shore has received little to no sex offender treatment from the BOP. And he has received *no* treatment for his ASD.

The Court specifically found that Shore could be rehabilitated with treatment. (ECF 50 at p.13). Indeed, the Court found that Shore, with treatment, can be "reasonably expected to conform his behavior to

the law so that he does not reoffend." (ECF 50 at p. 13). But the treatment the Court believed would be available to Shore has proved illusory. Shore has lost years of opportunity that could have been utilized to rehabilitate him and reduce his risk of recidivism.

Fortunately, the Court is not powerless to act.

A recent amendment to § 1B1.13 treats, as extraordinary and compelling, situations where a "defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." U.S.S.G. § 1B1.13 (b)(1)(C). While the lack of *psychological* treatment for Shore does not squarely fit within § 1B1.13 (b)(1)(C), it is "similar in gravity" to § 1B1.13 (b)(1)(C) such that the Court may grant compassionate release consistent with § 1B1.13 (b)(5).

Accordingly, for the reasons and arguments herein, the Court should reduce Shore's sentence to time served, modify Shore's conditions of supervised release to require that he remain on home confinement until March 25, 2030, Shore's currently scheduled release

date, except for Shore's participation in community based sex offender and ASD treatment.

## I. Background

(a)   <u>The Charges</u>

Michael Shore (Shore) was charged by a grand jury in the Eastern District of Pennsylvania with five counts of using the internet to persuade, induce, entice, and coerce a minor to engage in sexual activity in violation of 18 U.S.C. § 2422(b); three counts of employing, using, persuading, inducing, enticing, and coercing a minor to engage in sexually explicit conduct for the purpose of producing visual depictions of such conduct, a violation of 18 U.S.C. § 2251(a); one count of knowingly distributing visual depictions of minors engaging in sexually explicit conduct, a violation of 18 U.S.C. § 2252(a)(2); and one count of knowingly possessing material containing visual depictions of minors engaged in sexually explicit conduct, a violation of 18 U.S.C. § 2252(a)(4)(B). (ECF 1). Shore subsequently entered an open plea to the charges in the indictment.

(b)   <u>Shore's Sentencing</u>

Shore argued that his Autism Spectrum Disorder (ASD) significantly influenced his actions. For instance, Shore contended that his behavior was not driven by malice or intent to harm but was a manifestation of his inability to understand social norms and boundaries due to his ASD. (ECF 46). Shore argued that the Court should impose a sentence less than the mandatory minimum.

To help assess Shore's arguments, the Court received testimony from experts about Shore's ASD.

(1)   <u>Testimony of Dr. Elliott Atkins</u>

Dr. Elliott Atkins, a forensic psychologist, was called as the defense's expert. Dr. Atkins diagnosed Mr. Shore with Autism Spectrum Disorder (ASD) and highlighted the significant challenges Mr. Shore faces in social interactions and relationships, which are characteristic of individuals with ASD (ECF 56, pp. 7-8).

In his testimony, Dr. Atkins recommended a multi-faceted treatment approach for Mr. Shore, focusing on both the social and emotional manifestations of ASD and the sexual offending behavior. He emphasized the necessity of cognitive-behavioral therapy tailored to

ASD, which aims to improve empathy, self-awareness, and judgment. This type of treatment, particularly for ASD-related issues, could potentially take several years to be effective (ECF 56, p. 21).

Dr. Atkins further elaborated on the need for sex offender specific treatment, which typically ranges from 6 to 9 months but can extend up to 18 months. This treatment is designed to address the cognitive distortions and behavioral patterns associated with sexual offenses, similar to the cognitive-behavioral principles applied in the ASD treatment (ECF 56, pp. 21-22).

Additionally, Dr. Atkins underscored the importance of continued treatment and supervision upon Mr. Shore's release to mitigate the risk of recidivism. He advocated for specific conditions such as internet restrictions, avoiding situations involving minors, and ensuring that employers are aware of Mr. Shore's sex offense. These measures are critical in managing Mr. Shore's risk factors and supporting his successful reintegration into the community (ECF 56, p. 43).

Dr. Atkins' testimony highlighted the complexity of treating individuals with co-occurring ASD and sexual offending behaviors, emphasizing the need for long-term, specialized interventions both

during incarceration and post-release to ensure public safety and the individual's rehabilitation (ECF 56, pp. 7-8, 21-22, 43).

(2)   Testimony of Dr. Paul Channell

Dr. Shawn Channell, a forensic psychologist with the Federal Bureau of Prisons, was called as the Government's expert. Dr. Channell conducted a comprehensive evaluation of Mr. Shore over two months, corroborating the diagnosis of ASD and detailing Mr. Shore's behaviors and challenges (ECF 56, pp. 52-53). In his testimony, Dr. Channell provided detailed treatment recommendations for Mr. Shore, emphasizing the necessity of sex offender specific treatment based on cognitive-behavioral principles. This program, available within the Federal Bureau of Prisons, is designed to reduce recidivism by addressing the underlying cognitive distortions and behavioral patterns associated with sexual offenses. The program typically lasts between 16 to 18 months and involves a cohesive unit where participants engage in programming most of the day, every day, including individual sessions, group work, and psychoeducational activities (ECF 56, pp. 93-94).

Dr. Channell also provided insights into the treatment options available for individuals with ASD within the BOP. Dr. Channell

clarified that while the BOP does not have a specific structured program exclusively for ASD, it does provide necessary services to inmates with this condition. He noted that a "program" typically refers to a structured unit similar to the sex offender treatment program, which includes a dedicated living unit and comprehensive daily activities. However, for ASD, there is no such dedicated unit or specific structured program (ECF 56 pp. 101-102).

Despite the absence of a dedicated ASD program, Dr. Channell assured that the BOP offers substantial treatment services for inmates with ASD through various therapeutic interventions, including group and individual therapy sessions. These services are designed to support the development of empathy, self-awareness, and improved judgment, which are critical areas of deficit in individuals with ASD (ECF 56 pp. 102-103). He emphasized that inmates with ASD often require heightened interaction from mental health services to address their unique social and emotional needs, more so than the average inmate (ECF 56 pp. 102-103).

Furthermore, Dr. Channell testified that the BOP was equipped to provide the necessary level of intervention for inmates with ASD,

ensuring they receive adequate mental health services. He highlighted

that while individuals with ASD do not require inpatient treatment or

hospitalization, they do need more intensive mental health services

compared to other inmates, ensuring their specific needs are met

effectively within the correctional environment (ECF 56 pp. 102-103).

(3)   <u>The Court's Reasoning For Its Sentence</u>

The Court entered a detailed order addressing Shore's request for

a sentence below the mandatory minimum, and a variance from the

advisory Guideline range. (ECF 50). The Court began by summarizing

Mr. Shore's motion to bar the application of the mandatory 15-year

minimum sentence and his request for a variance from the guideline of

life imprisonment. Mr. Shore argued that the mandatory sentence is

grossly disproportionate given his unique psychological and emotional

history, specifically his ASD, thus violating the Eighth Amendment.

The Government countered by asserting that the mandatory sentence is

not grossly disproportionate and cited established precedent to support

its position (ECF 50, pp. 1-2).

The Court acknowledged the harshness of the mandatory 15-year

sentence, particularly considering Mr. Shore's ASD and its role in his

offense conduct. Despite recognizing the severity, the Court concluded that it must deny the motion to disregard the mandatory sentence as it does not violate the Eighth Amendment. However, the Court did consider a variance from the guideline of life imprisonment (ECF 50, pp. 2-3). The Court detailed the offense conduct, highlighting Mr. Shore's guilty plea to multiple counts of manufacturing child pornography and related charges involving interactions with minors. Mr. Shore's actions demonstrated a level of premeditation and intent that warranted the application of the statutory penalties (ECF 50, pp. 3-4).

The Court addressed the defense's Eighth Amendment arguments, citing relevant case law to support the conclusion that mandatory minimum sentences are not inherently cruel and unusual punishment, even for defendants with mental health issues. The Court emphasized that the Eighth Amendment's prohibition on cruel and unusual punishment does not preclude the imposition of mandatory sentences that reflect the severity of the crime and the need for deterrence (ECF 50, pp. 6-7).

Furthermore, the Court considered the defense's arguments regarding Mr. Shore's ASD and its impact on his behavior. The Court

found that Mr. Shore's ASD mitigated the gravity of his offenses, highlighting that individuals with ASD have extreme difficulty viewing the world through the eyes of others and often fail to notice when others suffer or misunderstand their feelings. The Court acknowledged that while Mr. Shore knew his actions were wrong, he did not fully appreciate the impact or consequences of his behavior due to his ASD (ECF 50, pp. 9-10).

In evaluating the penological goals of sentencing, the Court noted that retribution must be directly related to the personal culpability of the defendant. Given Mr. Shore's diminished culpability due to his ASD, the Court concluded that a 15-year sentence was not necessary to satisfy the need for retribution. The Court also considered the goals of deterrence, incapacitation, and rehabilitation, determining that the mandatory 10-year sentence Shore did not challenge would serve as sufficient deterrence (ECF 50, pp. 11-12).

The Court found that Mr. Shore can be rehabilitated through specific treatments, including sexual offender treatment and ASD-related therapy. These treatments would address his social and emotional challenges and reduce the risk of recidivism. The Court noted

that individuals with ASD are generally at a low risk of reoffending due to their rigid adherence to learned social rules. The Court acknowledged both the positive and negative aspects of incarcerating individuals with ASD, recognizing the difficulties they may face in prison, such as manipulation and victimization. "Incarceration in this case has a positive and a negative side. On the positive side, Shore can benefit from the Bureau of Prisons' psychological and psychiatric treatment specific to his offense conduct. These treatments are aimed at avoiding the consequences of future misbehavior" (ECF 50, pp. 13-14).

After balancing Mr. Shore's diminished culpability against the gravity of the offense and considering the penological goals of sentencing, the Court concluded that the mandatory 15-year minimum sentence raises an inference of gross disproportionality. Consequently, the Court conducted a comparison of sentences in the same district and other jurisdictions for similar offenses. Ultimately, the Court found that while the mandatory sentence is harsh, it is not grossly disproportionate when compared to sentences for similar offenses. Therefore, the Court denied the motion to bar the application of the mandatory minimum sentence but granted a variance from the

guideline of life imprisonment, reflecting due consideration of Mr.

Shore's personal circumstances alongside adherence to statutory

mandates (ECF 50, pp. 14-16).

On March 13, 2024, Shore requested compassionate release from

the Warden at FCI Oakdale. *See*, Exhibit 1.

## II. Standard of Review

Under 18 U.S.C. § 3582(c)(1)(A), a court may reduce a term of

imprisonment if it finds that "extraordinary and compelling reasons"

warrant such a reduction. The statute allows a defendant to request

compassionate release directly from the court after first exhausting all

administrative remedies through the Bureau of Prisons (BOP).

Specifically, the defendant must fully pursue and be denied a request

for compassionate release by the BOP or allow 30 days to lapse from the

date the request was submitted without receiving a response, whichever

occurs first. 18 U.S.C. § 3582(c)(1)(A).

The United States Sentencing Guidelines (U.S.S.G.) § 1B1.13

provide further guidance on evaluating compassionate release motions.

According to § 1B1.13, a reduction in sentence may be considered if the

defendant meets the following criteria:

1. **Medical Circumstances of the Defendant:**

    Terminal Illness: The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

    Serious Conditions: The defendant is suffering from a serious physical or medical condition, a serious functional or cognitive impairment, or experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

    Unmet Medical Needs: The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

<u>Infectious Disease Risk</u>: The defendant is housed at a correctional facility affected by an ongoing outbreak of infectious disease or a public health emergency, and due to personal health risk factors and custodial status, is at increased risk of severe medical complications or death, and such risk cannot be adequately mitigated in a timely manner.

2. **Age of the Defendant:**

The defendant is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process, and has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

3. **Family Circumstances of the Defendant:**

The death or incapacitation of the caregiver of the defendant's minor child or the defendant's child who is 18 years of age or older and incapable of self-care because of a mental or physical disability or a medical condition.

The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

The incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent.

Similar circumstances involving any other immediate family member or an individual whose relationship with the defendant is similar in kind to that of an immediate family member when the defendant would be the only available caregiver.

4. **Victim of Abuse:**

The defendant, while in custody serving the term of imprisonment sought to be reduced, was a victim of sexual abuse involving a 'sexual act,' as defined in 18 U.S.C. § 2246(2), or physical abuse resulting in 'serious bodily injury,' as defined in the Commentary to §1B1.1, committed by a correctional officer, an employee or contractor of the BOP, or any other individual who had custody or control over the

defendant. Such misconduct must be established by a

conviction, finding or admission of liability, or finding in an

administrative proceeding, unless unduly delayed or the

defendant is in imminent danger.

5. **Other Reasons:**

The defendant presents any other circumstance or

combination of circumstances that, when considered by

themselves or together with any of the reasons described in

paragraphs (1) through (4), are similar in gravity to those

described in paragraphs (1) through (4).

## III. Argument

U.S.S.G. § 1B1.13(b)(5) allows for compassionate release when

"any other circumstance or combination of circumstances that, when

considered by themselves or together with any of the reasons described

in paragraphs (1) through (4), are similar in gravity to those described

in paragraphs (1) through (4)." U.S.S.G. § 1B1.13(b)(5). This catchall

provision enables the Court to consider unique and severe situations

that do not fit neatly into predefined categories but are nonetheless

significant.

(a)     Comparison with § 1B1.13(b)(1)(C)

Mr. Shore's situation is analogous in gravity to § 1B1.13(b)(1)(C),

which acknowledges extraordinary and compelling reasons for

compassionate release when "the defendant is suffering from a medical

condition that requires long-term or specialized medical care that is not

being provided and without which the defendant is at risk of serious

deterioration in health or death." Although Shore's ASD does not fit

squarely within § 1B1.13(b)(1)(C), his circumstances are similar in

gravity because the lack of necessary psychological treatment places

him at significant risk of deterioration in his mental health.

(b)     Inconsistency with BOP Psychologist's Testimony

Dr. Shawn Channell, a forensic psychologist with the Federal

Bureau of Prisons, provided detailed testimony before sentencing on the

necessity of treatment for Mr. Shore. Dr. Channell conducted a

comprehensive evaluation of Mr. Shore over two months, corroborating

the diagnosis of ASD and detailing Mr. Shore's behaviors and

challenges (ECF 56, pp. 52-53). Dr. Channell emphasized the necessity

of sex offender specific treatment based on cognitive-behavioral

principles, designed to reduce recidivism by addressing the underlying

cognitive distortions and behavioral patterns associated with sexual

offenses. This program, available within the BOP, typically lasts

between 16 to 18 months and involves a cohesive unit where

participants engage in programming most of the day, every day,

including individual sessions, group work, and psychoeducational

activities (ECF 56, pp. 93-94).

Dr. Channell also provided insights into the treatment options

available for individuals with ASD within the BOP. He clarified that

while the BOP does not have a specific structured program exclusively

for ASD, it does provide necessary services to inmates with this

condition. A "program" typically refers to a structured unit similar to

the sex offender treatment program, which includes a dedicated living

unit and comprehensive daily activities. However, for ASD, there is no

such dedicated unit or specific structured program (ECF 56, pp. 101-

102).

Despite the absence of a dedicated ASD program, Dr. Channell

assured that the BOP offers substantial treatment services for inmates

with ASD through various therapeutic interventions, including group

and individual therapy sessions. These services are designed to support

the development of empathy, self-awareness, and improved judgment, which are critical areas of deficit in individuals with ASD (ECF 56, pp. 102-103). He emphasized that inmates with ASD often require heightened interaction from mental health services to address their unique social and emotional needs, more so than the average inmate (ECF 56, pp. 102-103).

Furthermore, Dr. Channell testified that the BOP was equipped to provide the necessary level of intervention for inmates with ASD, ensuring they receive adequate mental health services. He highlighted that while individuals with ASD do not require inpatient treatment or hospitalization, they do need more intensive mental health services compared to other inmates, ensuring their specific needs are met effectively within the correctional environment (ECF 56, pp. 102-103).

(c)    Medical and Psychiatric Neglect

The BOP has a statutory obligation to provide adequate medical and psychiatric care to all inmates. 18 U.S.C. § 4042(a). The lack of treatment for Mr. Shore's ASD over the past seven years constitutes severe neglect of this obligation. This neglect is particularly troubling given that effective treatment options were explicitly identified during

his sentencing. The failure to provide the necessary and promised treatment not only undermines the integrity of the sentencing process but also places Mr. Shore "at risk" of serious deterioration in his mental health.

(d)    Impact on Mr. Shore's Mental Health and Rehabilitation

Without specialized interventions, Mr. Shore remains at a higher risk of psychological distress, behavioral issues, and potential victimization within the prison system. The ongoing neglect of his medical and psychiatric needs is a compelling reason for compassionate release. Effective treatment for ASD is critical for reducing Shore's likelihood of recidivism and aiding his successful reintegration into society.

(e)    Risk of Serious Deterioration in Mental Health

The failure to provide necessary treatment for Mr. Shore's ASD places him at a serious risk of deterioration in his mental health. ASD is a lifelong condition that requires ongoing and specialized care to manage effectively. The absence of such care over an extended period can lead to significant worsening of symptoms, including increased anxiety, depression, and behavioral disturbances. This prolonged

neglect of Mr. Shore's medical needs creates an urgent need for intervention to prevent further serious deterioration in his mental health.

      (f)    <u>Extraordinary and Compelling Circumstances</u>

The combination of Mr. Shore's ASD, the failure to provide necessary treatment, and the resulting further risk of deterioration in his mental health create extraordinary and compelling circumstances that warrant compassionate release. These circumstances align with the spirit of § 1B1.13(b)(5), which allows the Court to address unique situations similar in gravity to the specifically denominated reasons in 1B1.13(b).

      (g)    <u>Alignment with Sentencing Intentions</u>

The original sentencing considerations included the expectation that Mr. Shore would receive necessary mental health treatment while incarcerated. The current lack of treatment is inconsistent with these expectations and undermines the rehabilitative purpose of his sentence. The Court specifically found that Shore could be rehabilitated with treatment and that he could be "reasonably expected to conform his behavior to the law so that he does not reoffend" (ECF 50, p. 13). The

failure to provide such treatment contradicts the intended outcomes of his incarceration and justifies a re-evaluation of his sentence under compassionate release criteria.

(h)   Consideration of 18 U.S.C. § 3553(a) Factors

In determining whether to grant compassionate release, the Court must also consider the factors set forth in 18 U.S.C. § 3553(a), which include:

1.   Nature and Circumstances of the Offense and History and Characteristics of the Defendant

While Mr. Shore's offense was serious, his ASD significantly influenced his behavior. His condition mitigates his culpability, as recognized by the Court during sentencing (ECF 50, pp. 9-10).

2.   Need for the Sentence Imposed

The sentence should reflect the seriousness of the offense, promote respect for the law, provide just punishment, deter criminal conduct, protect the public, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Given the lack of treatment provided, the goals of promoting respect for the law and providing necessary medical care have not been met.

3.      <u>Kinds of Sentences Available</u>

The compassionate release statute allows for the reduction of a sentence if extraordinary and compelling reasons are demonstrated. Mr. Shore's circumstances fit this criterion.

4.      <u>Sentencing Range Established for the Offense</u>

The mandatory minimum sentence was applied, but the Court has the authority to adjust this when granting a motion under § 3582(c)(1)(A).

5.      <u>Need to Avoid Unwarranted Sentence Disparities</u>

Granting compassionate release based on Mr. Shore's unique medical needs and the failure to provide necessary treatment would not create unwarranted disparities but rather ensure fair and just treatment under the law.

6.      <u>Need to Provide Restitution to Victims</u>

This factor is not directly impacted by the request for compassionate release.

(i)     <u>Public Safety Considerations</u>

Granting compassionate release to Mr. Shore would not compromise public safety. The Court found that with proper treatment, Mr. Shore could be rehabilitated and conform his behavior to the law (ECF 50, p. 13). The lack of treatment has hindered his rehabilitation, but with appropriate community-based treatment programs and supervision, Mr. Shore can manage his condition effectively. ASD is associated with a low risk of recidivism, particularly when individuals receive the necessary support and interventions. Furthermore, conditions of supervised release, including home confinement and mandatory participation in treatment programs, can ensure that Mr. Shore does not pose a threat to the community.

## IV. Conclusion

Mr. Shore's case presents clear and compelling reasons for compassionate release under § 1B1.13(b)(5). The BOP's failure to provide long-term or specialized psychological care for his ASD, despite explicit recommendations and available programs, places Shore "at risk" of further, significant deterioration in his mental health, and "at risk" of not achieving the rehabilitation the Court held Shore is capable of. If released, Shore will stay with his parents, who are prepared to

assist him in his efforts to obtain appropriate treatment the BOP

promised—but has failed to provide to date.

Respectfully submitted,

<u>/s/Brandon Sample</u>
Brandon Sample
Brandon Sample PLC
1701 Pennsylvania Ave. N.W. # 200
Washington, DC 20006
Tel: 202-990-2500
Fax: 202-990-2600
E-mail: brandon@brandonsample.com

*Attorney for Michael Shore*